UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2004 OCT 27  A 10: 06

UNITED STATES OF AMERICA )
) CRIMINAL NO. 04-CR-10396-NG
v. )
)
KAM WAI CHUI, )
)
Defendant. )

## GOVERNMENT'S SENTENCING MEMORANDUM

On May 24, 2004, in the absence of a plea agreement, Kam Wai Chui pleaded guilty to all counts charged in the Indictment in this case, namely five counts of mail fraud and four counts of money laundering. Sentencing is scheduled for Monday, November 1, 2004. Mindful of the Court's decision in United States v. Muffelman, 327 F. Supp. 79 (D. Mass. July 26, 2004), the government will urge the Court to sentence the defendant to a term of incarceration that would have been dictated by the Guidelines, that is, at the low end of the applicable range of 41-51 months.[1]

This sentence appropriately would reflect the seriousness of the defendant's conduct, which entailed his stealing more than $200,000 from his employer, the stock transfer company Equiserve, Inc., by using an intricate web of phony accounts that would have allowed him, if Equiserve had not stumbled onto his scheme, to have stolen far more. In addition, because the defendant's conduct is of a sort that directly threatens the integrity of the financial system – Equiserve itself purports to be the country's largest stock transfer company – it is important that

---

[1] The government hastens to note, for the record, its position that Blakely v. Washington, 124 S.Ct. 2531 (June 24, 2004) does not apply to the U.S. Sentencing Guidelines, and that the Guidelines apply in full to this case.

the Court convey a firm deterrent message to financial company employees who, like the defendant, may be inclined to engage in the same conduct. The government submits that its proposed sentence would send such a message, and would vindicate the integrity of the financial system. A sentence of forty-one months also would be proportional to the sentences of the defendant's co-schemers, Jie Ling Cho, the defendant's former girlfriend and mother of his child, and her brother, Tony Cho. Both face sentencing before other judges and, although they are less culpable than the defendant and benefitted less from the scheme, they are likely to be sentenced to periods of incarceration.[2]

What follows is a summary of the defendant's conduct. Because the defendant has objected to each sentencing enhancement and adjustment set forth in the Presentence Report *without stating a basis for any of his objections*, the government also sets forth below its positions as to the applicable guidelines. To the extent that it is necessary to support its position with evidence, the government intends to call one or more witnesses, including Dan Dearden, the head of security at Equiserve; U.S. Postal Inspector Gerry Carmody, the lead agent on this case; and Tony Cho.

---

[2] Jie Ling Cho awaits sentencing after having pleaded guilty to one count of making a false statement on behalf of Chui in violation of Title 18, U.S.C. § 1001. See United States v. Jie Ling Cho, 03-10400-JLT. Tony Cho will be sentenced in two weeks, having pleaded guilty to one count of making a false bank entry for the purpose of opening up a bank account for Chui under a false name, in violation of Title 18, U.S.C. § 1005. See United States v. Jing "Tony" Cho, 03-CR-10401-RWZ.

## SUMMARY OF THE DEFENDANT'S CONDUCT

A.   Equiserve's Business

Equiserve operates essentially as a custodian of corporate stock, enabling its corporate clients to complete large stock transactions electronically without having to engage in the archaic exercise of physically collecting and re-issuing paper stock certificates. Equiserve also provides limited brokerage services to its clients' shareholders that permit them to trade stock in individually-directed accounts by phone or mail or via Equiserve's web site.

B.   Chui's Scheme

Chui worked at Equiserve from October 30, 2000 to December 20, 2002 as a Processing Associate, a job that essentially entailed his entering shareholder trading instructions into Equiserve's computer system. Beginning in June 2001 and continuing until he was fired on December 20, 2002, Chui established stock accounts with fictitious names and social security numbers, and transferred shares from existing accounts into them. He was able to do this by gaining access to Equiserve's system at his own terminal using his unique and confidential user name and password, and entering the pertinent information and instructions. Most of the shares ended up in accounts under the fictitious name "Daniel Chang" (or a close variant like "Daniel Chong" and "Daniel Zhang), as well as other phony names.

After completing a transfer, Chui usually would call Equiserve's trading line claiming to be the holder of the phony account, and would order the sale of its shares. Per its standard operating procedures, Equiserve would mail a check of the proceeds to the account holder's address of record, which, in the case of the Chui's phony accounts, were addresses controlled by Jie Ling Cho, whom he had recruited to help with the scheme. At his prompting, she in turn

3

would deliver the checks to Chui so that they could be cashed. Some of the checks were sent to a post office box that Chui had asked Jie Ling Cho to establish under a phony name and address.[3] The checks Jie Ling Cho received from Chui ranged in amount from approximately $200 to over $30,000.

C. <u>Means Used to Conceal Scheme</u>

Chui employed a number of means to conceal his scheme. First, he selected accounts from which to steal stock based on their recent trading activity. Chui realized that an active account indicated that the holder was paying attention, so he tended to select relatively dormant accounts. Sometimes he would zero in on accounts containing stocks that had split. In those instances, he would siphon off only the new split shares, knowing that if the account holder was unaware of split, he or she likely would not notice anything missing from the account.

Second, once he had selected an account, he often would transfer stock among several of his phony accounts, which were under a variety Chinese and English names, to make the transactions more difficult to trace. Knowing also that Equiserve's compliance personnel monitored the company's activities in part by tracking the unique "batch numbers" that are assigned to every transaction, Chui often went back into the system and altered the batch numbers on his transactions.

Third, he also attempted to mask his identity as the person who ordered the sale of shares from the phony accounts. Instead of calling the Equiserve trading line, sometimes he would submit sale orders by mail. On one occasion, he even had his sister, Yau Nee Chui, order the

---

[3] The false post office box application submitted by Jie Ling Cho is the basis of the false statement charge to which she pleaded guilty.

4

sale of shares from Equiserve's website. In addition, to conceal the destination of where the proceeds checks were mailed, namely Jie Ling Cho's house at 263 West Street, Quincy, MA 02169, he invariably listed the address in Equiserve's system as 261 West Street, Boston, MA 02169. He knew that despite the incorrect street number and city, the correct zip code would permit the Postal Service to deliver the checks to their intended recipient.

D.   Financial Transactions

Because the checks were not in his name, Chui could not simply cash them at a bank. To overcome this obstacle, he enlisted the help of Tony Cho, who at the time was an assistant manager at a Citizens' Bank branch in West Roxbury. At Chui's request, Tony Cho opened a Citizen's checking account in the name of "Daniel Chang" without documenting any proof of the identify of the account holder, in knowing violation of bank procedure.[4] Thus, when the Equiserve checks arrived at the addresses controlled by Jie Ling Cho, Chui would endorse and deposit them directly into the Daniel Chang bank account. Ultimately, the account served as nothing but a pass through. All of the funds deposited into it came from Equiserve checks. Nearly all the funds were withdrawn, either in bank checks or personal checks written to Jie Ling Cho. The checks either were cashed or were deposited into Jie Ling Cho's account, to which Chui had access.

E.   Aftermath of Chui's Firing

On the day of his firing and twice thereafter, Chui was interviewed by postal inspectors. On each occasion Chui insisted that despite his part in siphoning off stock from legitimate

---

[4] Tony Cho's decision to open this account under a false name is the basis of the false bank entry charge under 18 U.S.C. § 1005 to which he pleaded guilty.

shareholders, the person ultimately responsible was "Daniel Chang," the name that appears on most of the phony Equiserve accounts as well as the bank account at Citizens Bank. He even gave a physical description of "Daniel Chang" and said that he might be living in New Hampshire. Chui also insisted that Jie Ling Cho, who has since pleaded guilty in connection with this case, had nothing to do the scheme.

These representations sent the government off onto what was, in retrospect, a tangent. It expended considerable resources in trying to determine whether Daniel Chang actually existed. Specifically, the government performed several unnecessary interviews and spent substantial amount of time searching databases, including those at INS and the Social Security Administration, looking for him. In the end, the government concluded that there was no Daniel Chang.

Once Chui learned in the Summer of 2003 that he was going to be indicted, he fled. This, too, impelled the government to expend resources unnecessarily. In particular, the government spent an inordinate amount of time seeking orders to place pen registers on Chui's relative's phones, and once the devices were in place, monitoring the phones. The government also sent leads to other field offices to see whether they could track him down. Six months passed before Chui was arrested in Canada on the arrest warrant that the government had obtained for him. He has been in custody ever since.

## SENTENCING GUIDELINES CALCULATION

The government submits that the Guidelines apply as follows:

A.    Mail Fraud

   1.    Base Offense Level under Section 2B1.1 (Mail Fraud)

The base offense level under U.S.S.G. §2B1.1 (November 2001 edition) is 6.

   2.    Fraud Loss

Under U.S.S.G. §2B1.1(b)(1)(G), the defendant's offense level should be increased 12 levels because the loss attributable to his conduct was greater than $200,000 but less than $400,000. "Loss" for purposes of this guideline is the greater of the actual loss caused by the offense and the intended loss. U.S.S.G. §2B1.1, comment, n.2(A). Intended loss includes both the amount the victim actually lost and any additional amount the defendant intended the victim to lose, but was unsuccessful. U.S. v. Robbio, 186 F.3d 37, 43-44 (1st Cir. 1999).

The total intended loss attributable to the defendant's scheme is **$211,996.82**. This figure consists of several components. The largest is the actual loss occasioned by the scheme, **$155,504.54**; that is, the value of the Equiserve checks Chui deposited into the Daniel Chang account at Citizens Bank. The intended loss includes the total transaction fees imposed by Equiserve on each stock sale, **$270**; the checks that Equiserve was able to stop before they cleared the Daniel Chang account, **$22,175.47**; and the value of stolen stock remaining in Chui's phony Equiserve accounts on the day he was fired, **$34,046.81**.

The government will be prepared to call Dan Dearden, the head of security at Equiserve, as a witness to explain these figures.

7

3. <u>Offense Involved Sophisticated Means</u>

U.S.S.G. §2B1.1(b)(8)(C) provides a two-level upward adjustment for offenses involving "sophisticated means." Sophisticated means often involves "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense . . . , including hiding assets or transactions...through the use of fictitious entities." U.S.S.G. §2B1.1(b)(8)(C), comment, n.6(B). Courts have recognized that long-running, evolving fraud schemes, as well as those that include elaborate measures to escape detection, merit the sophisticated means enhancement. <u>Id.</u>; <u>see also</u>, <u>United States v. Rettenberger</u>, 344 F.3d 702, 709 (7th Cir. 2003) (imposing enhancement where "careful execution and coordination over an extended period...to bilk more [victims] and reduce the risk of detection" supported enhancement); <u>U.S. v. Humber</u>, 255 F.2d 1308, 1310-1311 (11th Cir. 2001) (imposing enhancement where long-running, complex embezzlement scheme constituted use of sophisticated means).

Chui's scheme was sophisticated in two principal ways. First, he attempted to conceal his theft of stock from legitimate accounts by passing the stock through multiple phony accounts before ordering its sale. He also exhibited enough savvy to siphon stock from accounts that contained split shares from which he would remove half the shares and, in so doing, making it less likely that the account holder would notice. In addition, he knew that Equiserve tracked transactions principally by batch number and altered the numbers from time to time to obscure his activities even further. All of these steps required a knowledge of complex securities tracking systems far beyond the ken of most people.

Second, Chui used fictitious entities to conceal his scheme. The numerous accounts Chui created at Equiserve and Citizens Bank were all fictitious, created for the sole purpose of hiding

his scheme. Chui further tried to hide his scheme by deliberately listing the fictitious accounts' address of record in a way that would allow the postal service to deliver the checks to their intended destination (because the zip code was correct), but would not otherwise allow a more casual observer to figure out where exactly the mail was going (because the street address was incorrect).

For all of these reasons, the Court's Guideline calculation should include the sophisticated means enhancement.

4. <u>Role Adjustment</u>

U.S.S.G. §3B1.1(c) imposes a two-level adjustment if the defendant "was an organizer, leader, manager, or supervisor in [the] criminal activity." This adjustment is appropriate where 1) the scheme involved at least two complicit participants (including defendant); and 2) the defendant exercised control over, organized, or otherwise supervised at least one other person's activities. <u>U.S. v. Cruz</u>, 120 F.3d 1, 3 (1st Cir. 1997) (en banc). The Comments to this Guideline list seven factors for the court to consider in applying the adjustment: 1) the exercise of decision making authority; 2) the nature of participation in the commission of the offense; 3) the recruitment of accomplices; 4) the claimed right to a larger share of the fruits of the crime; 5) the degree of participation in planning or organizing the offense; 6) the nature and scope of the illegal activity; and 7) the degree of control and authority exercised over others. U.S.S.G. §3B1.1(c), comment, n.4.

The evidence unambiguously establishes that Chui was the leader and organizer of this fraud scheme. First, Chui's scheme meets the <u>Cruz</u> test because his scheme included two other accomplices whom Chui recruited and whose assistance Chui controlled and organized. Second,

the scheme was predicated essentially on Chui's knowledge of Equiserve's systems. None of the other participants could possibly have conceived the scheme. Jie Ling and Tony Cho essentially enabled him to convert stolen stock into cash. In short, the scheme revolved around Chui.

5.  Conclusion

The total offense level for the mail fraud counts is 22, which includes a base level of 6 with an increase of 12 (loss over $200,000), 2 (sophisticated means), and 2 (role adjustment).

B.  Money Laundering

1.  Base Offense Level under Section 2S1.1 (Money Laundering)

The base offense level for money laundering is that of the underlying offense from which the laundered funds were derived. See U.S.S.G. §2S1.1(a). As calculated above, the offense level for the mail fraud counts (not including Chapter 3 adjustments) is 20.

2.  Conviction under §1956

Under U.S.S.G. §2S1.1(b)(2)(B), the Court should increase Chui's offense level by two levels because he was convicted of violating 18 U.S.C. § 1956.

3.  Role Adjustment

U.S.S.G. §3B1.1(c) imposes a two-level adjustment if the defendant was the leader or organizer. Chui recruited Tony Cho, a manager at Citizens' Bank, to open a bank account using a fictitious name, in violation of bank rules and applicable reporting requirements. On Chui's behalf, Tony Cho deposited Equiserve checks into the account. Without this assistance, Chui would not have been able to launder the funds.

10

4.  Conclusion

The offense level for the money laundering counts is 24.[5]

C.  Grouping and Total Offense Level

U.S.S.G. §3D1.2 provides that the mail fraud and money laundering counts are to be grouped. The counts yielding the highest offense level in the group is used for sentencing. See U.S.S.G. §3D1.3. If the Court reduces the defendant's offense level by three levels based on a finding that he has accepted responsibility, his total offense level would be 21.

D.  Criminal History

Chui's criminal history includes a charge for reckless operation of a motor vehicle in 2001. Chui admitted, and the court found, sufficient facts and entered a continuance without finding for a one year probationary period commencing October 18, 2001. Cases that are dismissed after the defendant has admitted to facts sufficient to sustain a conviction are treated as convictions under the Guidelines. U.S. v. Morillo, 178 F.3d 18, 20-21 (1st Cir. 1999). U.S.S.G. § 4A1.2(c)(1)(A) imposes a one level adjustment for the offense of reckless driving resulting in a sentence of probation for one year.

In addition, Chui committed the mail fraud and money laundering offenses while under the probation sentence for reckless driving. U.S.S.G. § 4A1.1(d) imposes a two-level adjustment if the defendant commits "the instant offense while under any criminal justice sentence,

---

[5] The government did not object to Probation's determination that the obstruction of justice adjustment applies and that the acceptance of responsibility adjustment does not apply. The government has reconsidered its position, however, and will not contest the defendant's position that the upward adjustment for obstruction-of-justice does not apply and that the downward adjustment for acceptance-of-responsibility does apply.

11

including probation." Thus, the total number of criminal history points is 3, placing Chui in Criminal History Category of II.

## CONCLUSION

With a total offense level of 21 and a Criminal History Category of II, the defendant's sentencing range would be 41-51 months. For the reasons set forth above, a sentence at the low-end of the range would be a just sentence in light of the seriousness of the offense and the likely sentence of Chui's less culpable co-schemers, and it would send an appropriate deterrent message to others who might engage in the same sort of conduct.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: _____
Jonathan F. Mitchell
Assistant U.S. Attorney
U. S. Attorney's Office
John Joseph Moakley
United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02210

## CERTIFICATE OF SERVICE

I hereby certify that on this day I will cause a true copy fo the above document to be served by mail and fax hand upon counsel of record for defendant:

Robert Jubinville, Esq.
Mark Bennett, Esq.
487 Adams Street
P.O. Box 509
Milton, MA 02186
fax (617) 296-4783

Dated: October 27, 2004

Jonathan F. Mitchell
Assistant U.S. Attorney